The next matter, number 24-1973, Gavin McKenna et al. v. Maine Department of Health and Human Services. At this time, would counsel for the appellants please introduce himself on the record to begin. Good morning, Your Honors. Richard O'Mara from Murray Plum and Murray on behalf of the appellants, the McKennas. Let me please begin by offering my condolences to the Court and the Court staff on the loss of Judge Celia. Thank you. The McKenna's complaint in this case alleges an associational discrimination claim in violation of Title II of the ADA. The question on this appeal is whether Congress possessed the power to abrogate the sovereign immunity of the State of Maine so that it must answer this complaint. And because the Department's actions in this case both interfered with a fundamental right of family association and lacked a rational basis, as found by the State of Maine Superior Court already, this power existed as a violation of the Equal Protection Clause for Congress to abrogate sovereign immunity, which it has done, and this Court should recognize that and reverse the case. I'll begin with the fundamental right of the familial association. This is a case where the family lived together in a single home. They had one home with two young men with disabilities, both of whom qualified for Medicaid, and they qualified at a level for institutional care, which meant that they would be taken from the family, segregated into an institution in order to receive the care they needed under Medicaid. This was all done through the Department's procedures. They have person-centered planning teams that evaluate and assess the information and then make this determination. Because of that, these young men were always at risk of institutionalization. And as things progressed over the three years before the Superior Court ruled in this case, they were always at risk of institutionalization. And the Department's answer to them as to why they both- So your complaint doesn't say that, though, does it? I mean, it doesn't actually say that the family was considering institutionalization or might be forced to institutionalize them. I mean- What the complaint says, Your Honor, is that they were always under institutional care eligibility, and we also talked about the fact in the complaint that the parents had to challenge in Superior Court what the Department had done. And we also appended parts of the Superior Court's ruling that they eventually won in 2022, and the District Court had this at the time of the motion to dismiss. And so if we needed to plead something more, there should have been leave to amend the complaint. But, of course, this is an affirmative defense, and we're not required to plead all the answers to the affirmative defense in the complaint. However, you have, and the District Court had, a Superior Court ruling that said, and this was on the whole record, that the record establishes that one shared living provider serving both of the petitioners was unsustainable over time. So that was in the record, and it was referenced in the complaint. If something more was needed, then we should have been given a chance to amend the complaint. I think the complaint certainly points out the fact that when you have two young men who've qualified for institutional care and a Superior Court ruling saying it's unsustainable to just give them half the care, which is medically necessary, that there's enough there for the District Court to recognize that the familial association right was going to be in peril here throughout the period. The family did not have a second home, even though the Department told them they could set up two different homes for these young men, which would have involved splitting the parents up because the parents were serving under this program as the direct service providers. And so the only other option for this family, if they couldn't win at the Superior Court, and they mounted a three-year effort to do that, if they couldn't win at the Superior Court, would have been to have at least one of the young men institutionalized and break up the family. Under that, this is a violation of equal protection because it violates a fundamental right and it would be subject to strict scrutiny. Let me ask you this, leaving aside what is stated in your complaint or not. The cases in your reply brief regarding the fundamental right analysis involve courts that analyze the threat of potential future family separation, but here the brothers weren't separated. And the exact interference at issue, I think, is the burden that's placed on their parents. Are there cases that draw that distinction or support finding that that type of burden, the immediate burden that was placed on the parents, is direct and substantial? We haven't found any cases like this, Your Honor, that really are on all fours with this situation. And this case is unique, too, because it has the Superior Court ruling, and I think that distinguishes us from a lot of the other situations where courts have wrestled with the abrogation of sovereign immunity based on the 14th Amendment. How do you wrestle with the right to live as a family and all the substantive process rights typically don't require the government to fund your exercise of the fundamental right? So abortion was a right for a long time. There's a famous Supreme Court case that says Medicaid doesn't have to pay for the right. That certainly precludes people, when that was a right, from exercising it. And the answer was, well, the government doesn't have to fund it. I'm not defending anything that went on here, but as a matter of constitutional law, why does that not answer the family living as a family argument? Well, the government may not have to fund it, but here there is a program that the government qualified both of these young men for. And so there was never a situation where the government said, you don't qualify or we think that your situation is not worthy. So that makes it a state law violation. I follow that. But ultimately what's happening that you say impinges on the right to live as a family is a lack of funding. There wasn't enough money coming from the state to make that happen. It is undisputed that that was a wrong decision. But does that wrong decision make it an unconstitutional violation? I don't understand why that wrong decision makes it an unconstitutional violation of the right to live as a family. Well, it's unconstitutional because the interference with the familial rights and the familial association is based on a state decision that basically doesn't follow the Equal Protection Clause. That's the point. You have a situation where they were entitled to these services and the only situation in which they were not going to get them is if they chose to live together. And so under that scenario, you have a direct threat to the familial association right. It's the only reason given. It's not like we have other reasons here. And the threat is a financial, not enough money. So it puts them to the choice of separate to get more money or stay together because we're going to get less money. But it is a financial. There's no rule that says you must live apart. It's just you're not going to get as much money. I don't mean just, but there's not enough money. So that's your choice whether you live together or not. But if you live together, you get less money. On the fundamental right issue, I guess you're now turning to the rational basis, which I'm going to get to. But on the fundamental right issue, there was never any indication that there was not enough money. The department actually told them, live in two different houses and you'll be good, to a family that was struggling to keep the one house that they had. And the only other option, of course. But the only thing that was breaking the family apart is lack of funding from the state. Correct? No. Well, it would be institutionalization that would then follow from the fact that, as the Superior Court found, it was unsustainable not to give these young men the services they qualified for. But if that's the mechanism for breaking up the family, we don't have a situation here where the state is saying you can't live together or anything like that. As I understand it, what you're pointing to is the financial impact of not having more than the $57,000 a year puts a threat on their ability to sustain, as an economic model, what they would like to sustain that keeps the family together. If that's the line of reasoning, then it poses the question, well, suppose the state just said, we're providing institutional care, but we're not going to provide any in-home care. That might violate some Medicaid statute or something like that, but would it violate the Constitution? And if not, then why would this? I think it does violate the Constitution because, obviously, as it says in Tennessee v. Lane, the history of the statute of the ADA was to repair and remedy constitutional violations where people with disabilities were improperly segregated and institutionalized. So let me say, so if someone needs to be 24-hour day care, you're saying the state has a constitutional duty to fund in-home care for that person? There's no constitutional duty to fund the care. Okay, so if the state cut off all funds altogether, would you have a case? I think we would if it resulted in the segregation of all people with disabilities in institutions. I do think that would violate the Constitution, and it certainly violates the ADA. So I think you're saying the state had a constitution. Forget about the two of them, just one. You're saying the state had a duty to fund the in-home care of that one child. If the opportunity to do so is there and it would result in institutionalization, I think that that's an involuntary commitment that would be challenged under the Constitution, Your Honor, yes. And is there any case that says that the state has a duty to fund in-home care if the only alternative is institutionalization? I'm not aware of any, Your Honor. The second rationale that was given in this case, which was the rational basis test, which the district court did apply or purported to apply, and we don't think that it was done correctly, we don't think it's the right test, but this court has said that equal protection cases have to be sensitive to the circumstances of the case. And we agree. And here with the superior court review happening on the whole record... Can I ask you a question because I'm worried I misunderstood this? But I understood your argument on a government act in contravention of the law, so cited to the main superior court's findings, that part of your argument was, for that rational basis wasn't appropriately applied here, was that it wasn't the law itself but the action in violation of the law that was at issue. And I'm just, I'm struggling, maybe I'm not articulating that argument. I'm struggling to find cases that make that, the differentiation there. I think what Your Honor is talking about is the fact that there is a finding of the superior court here that this was improper and it actually stopped the illegal conduct in the middle of 2022, which is what allowed both young men to stay out of the institution. However, I think that superior court decision really helps us because it rules that the DHHS action was unreasonable, unjust, arbitrary, and inconsistent with the needs of the members. And so then when you go to apply rational basis, you have to look at the court decision that already considered the whole record and said this is completely irrational. It makes no sense to set up a situation where the only people who aren't going to get the benefits that the statute calls for are the ones who are trying to live together in the same home with their family. That seems to say, if I'm following you correctly, that when we're confronting agency action, the rational basis test would not simply ask, is that action as articulated by the agency rational? But we would also have to ask, is that agency action in compliance with state law? And I thought our president was pretty clear that we don't do that. I don't think it's the fact that it's not in compliance with state law, Your Honor. I think it's how it's not in compliance with state law, that it's been found to be irrational, unjust, and arbitrary. And that's the test that you're supposed to apply for the rational basis test. So you're applying estoppel, preclusion? I don't think it's necessarily estoppel. It's a different proceeding. It's not law of the case in this case. But I think as the district court looked at the factors, this was the most important factor, is that someone who had looked at the entire record had said, from the judiciary, had said this is an irrational, unjust, and arbitrary way to categorize these people. And you think that – I'm trying to get at whether you're arguing issue preclusion on the issue of rationality. I don't think it's issue preclusion because I think it was a separate case under a different standard. However, that is the same test that this court is supposed to look at is, is there a rational basis for basically classifying people this way? And the superior court already said, no, it makes no sense. It's actually not only contrary to the law, but it's adverse to the members of this plan and their interests. But it does save the state money. So I'm wondering when you take those words out of an administrative law decision and superimpose them on rational basis under the Constitution, whether those really are the same thing, this seems very much decided to be not in compliance with main law. But it was still a decision based on an interpretation of the word arrangement that has been since found to be erroneous that saved the state money. Is that not an interest the state has? Yeah. It is an interest the state has. However, in the rational basis application, in cases where you're looking at the circumstances, the question is not just does it save money? The question is, does it rationally save money? Is that a rational basis? And what we're saying here is the superior court already has said this is an irrational approach to not fund these two students. And remember, this is a situation where the services they're getting are not just welfare. This is medically necessary care as determined by the department and its procedures. Right. But how do you distinguish? So that may be a bad decision, even a mean decision. But it still has a rational basis review. I mean, the court can come up with the reason. I mean, there's all sorts of ways to make rational basis review very hard. I guess I wonder if you're transposing how bad of a decision it was to how unconstitutional a decision it was. My response, Your Honor, is that there has to be rationality to any cost-saving approach. This case lacked rationality. And if you do go to the rational basis test, we urge you to reverse on that ground as well. I think you're going to go over your time, and that's fine. And we have a few more questions for you. So help me with this. The premise, as I understand it, for this is in part that there's economies of scale, is that what it would cost one person to service one individual is not duplicated when you add a second individual because the same person could, like, be there, be present, whatever. Should we assume that there's some economies of scale, and your position is, though, that it's irrational to think it would be 50 percent? Or is your position that there are no economies of scale at all? Our position is there's no economies of scale here. Both of these young men had already been evaluated by the Department's processes and been deemed to be medically necessary in need of care for 24-7 from a shared living provider. So they both had to have full-time care. And it didn't really help to have one person on two, as was approved. The second person had to be there, and that was done essentially because of the parents' own voluntary actions during the 19 to 22 years. Well, how should we think about it? If we should decide that it's at least rational to think there would be some economies of scale, then what should we do next? And I realize you don't think we should start with that premise, but if we should, how would you say we should then proceed? I don't think you can proceed on economies of scale because the Department controls this process, and the Department's own process led to the fact that each of them needed one-to-one care 24-7. There was never a suggestion that anyone could survive with less care than that in the community. They would have to be institutionalized. I'm sorry. Actually, now I have a further question. You're saying it was the Department's position that in the community, neither could survive without one-to-one care. But what the Department, I think, argued was that there were cost savings here because of the economies of scale of taking care of two brothers at the same time in the same house, there would be some overlap. And we're saying that's irrational, and the Superior Court found that to be irrational. Well, you don't need a second house. I'm not following you, Your Honor. Sure. One of the economies, if you just have one person, you need a caregiver and a house for them to live in. If you have two people, you need still one house if they live in the same house. You don't need two houses. That's a pretty substantial savings. Well, it's a savings to the family not to have to have a second house. That doesn't save the State any money. Well, the State can reason rationally that if it saves the family, we therefore will reimburse the family left to offset that savings. I'm not saying this is right or reasonable, but it does seem to me common sense and at least rational to think there would be some economies of scale. There's no payments for the house from the State. The State is just simply paying a care provider, a shared living provider, fee for service. That's all it is. They don't pay for the car or the house or food or anything else. It's not part of this program. Well, but what do the parents spend the money on? Well, the parents are running their household with what they earn as the shared living providers. And that's the $57,000 per student, per individual now. Well, remember, the payments are not all recognized by the family. The payments that you see in the record go to the administrative organization that oversees it and then they pay the parents a portion of that as a stipend. So the parents don't get the $140 per day? Correct. How much do they get? I think there's up to a 40% administrative fee on this. I don't know the exact number, Your Honor, but it's not 100% to the parents. Can I ask one more question? So can you just walk through, if you're not, if we disagree that these are actually constitutional violations, but that this fits under the prophylactic city of Bernie, can you walk through how you think we should think about determining that? Yes. I think, well, part of the problem here is the same issue you and I discussed a few minutes ago, which is does the complaint allege institutionalization as a risk? I think it does. The district court basically threw out the prophylactic test on the same reasoning, that there was no risk of institutionalization here. Tennessee v. Lane already gives us the first two points there, because it says that it's a constitutional right not to be involuntarily committed to an institution and that there's a long history of cases in that area. So I think we have the first two points made by Tennessee v. Lane, if you believe, as we could show if we amended our complaint more specifically, that there was a risk of institutionalization. Okay. So did you ask to amend the complaint? Or, I mean, did you move to reconsider or try to tell the district court you had more allegations to make? No, not since the motion was decided. So we're on appeal now. One of the things we're asking is the reverse, obviously. But if Your Honors believe that the case needs an amended complaint, the dismissal should be without prejudice. So I just want to make sure I just understand this. Your point, your argument is the reason this is within the prophylactic zone of the 14th Amendment is because the complaint sufficiently alleges that if the state didn't fund, that would cause institutionalization and that, while it may not be a 14th Amendment violation, is in the, I'll call it, zone of interest. I'm not sure that's the right term.  But of the 14th Amendment. Yes. That is your position. Yes. And the ADA is congruent and proportional in trying to resolve that by having both the Olmstead decision on the integration mandate and the type of claim that we're bringing here for discrimination in order to realize it. Well, to be more precise, I think if we read the complaint that way, it would be that it creates a risk, an increased risk of institutionalization because here, in fact, there was no institutionalization. There wasn't at the time of the Superior Court decision, Your Honor, but what the Superior Court said was that that situation was unsustainable. And if we plead an amended complaint, you'll have more facts before you, but the situation was unsustainable. The parents had poured everything they had into fighting this at the Superior Court in the hopes of keeping their sons at home. They couldn't keep doing it, and so there would have been institutionalization. Just a procedural question. Why has Maine has not paid for the back years? Is that right? That that's what you're suing for? Correct. The Superior Court decision was forward-looking only, Your Honor. Is there litigation in Maine about the backward-looking? No. There's this case. Is there no entitlement in Maine to that? That case has not been brought. Would mediation be helpful to this case? We've tried to mediate, but part of the problem when we mediated was the judge had not yet resolved the abrogation of sovereign immunity issue, and so the parties were very far apart. So we're hoping that mediation will help once we get a final ruling from this court. If there's nothing further, I'm way over time. Thank you very much. Thank you, counsel. At this time, would counsel for the Maine Department of Health and Human Services please introduce herself on the record? Good morning. Kelly Morrill, Assistant Attorney General for the Maine Department of Health and Human Services. May it please the Court. The District Court applied the tests set forth in Georgia, U.S. v. Georgia and the City of Bourneville, and correctly held that the McKenna's Title II ADA claim was barred by sovereign immunity. So the issue before the Court under the Georgia test is whether there was an actual violation of the 14th Amendment. And to start that analysis out, the Court has to determine what level of scrutiny needs to be applied to the equal protection analysis. And the District Court properly applied the rational basis scrutiny to that claim. Let's assume that that's correct. Could you explain how it was rational to find, first, that each individual required services costing $140 a day, and then to say, but if they're in the same house with one provider, it's not an additional penny? What's the rationality behind that? Well, I think under an equal protection analysis, under rational basis, it can be any conceivable set of facts that would provide a rational basis for the decision. And Attorney O'Meara talked about the Superior Court decision and the fact that the Court found that the Department's decision wasn't rational. But in that case, the Court was looking at the specific record before it regarding the McKenna's particularly. There was no equal protection case before the Court. There was no discrimination claim before the Court. For equal protection, it can be any conceivable set of facts, even facts that are not in the record, any reasons that are not in the record. So what is it? What fact are you telling us? Because what I, just to put a little point on it, Judge Kayada suggested in the prior argument to your friend there, well, economies of scale, okay, maybe. But you interpreted, you brought that down to zero. And that can't possibly be right, because some of the money has to be for the care, I think a lot of the money has to be for the care provided by the person to the member. So what's the rational basis for that? It is cost-saving in the fact that the Maine legislature approved a reimbursement rate for the care of two persons in the same home by one support professional. The money that is saved by paying only one provider can be put into services to be provided to other Maine CARE members who also need services. Because Maine CARE funds are not unlimited funds. But there were two providers. That's clear. There were two providers in this culture providing services, but the rationale of the rule is that there will be one service provider in each home providing care for two members. That is generally the application of the rule for most Maine CARE members who receive these shared living services at the same location. I believe in this case both of the parents were ultimately authorized to provide the services, but at the lower reimbursement rate. But generally the way the rule is applied, it's for one service provider to be providing services to the two members at the reduced rate. I think while Mr. O'Meara is standing up again, he would probably say, but hasn't the State effectively found that one individual requires the full-time service of one service provider? That did happen in this case, in the administrative case, yes. But when we're looking at equal protection, we're not looking at the specific circumstances of the McKenna's or any other particular plaintiff. When we're looking at a generally applicable rule. So it doesn't make the rule unconstitutional because it doesn't work for the McKenna's necessarily. But if you generalize that, you've applied the rule in a situation where the State, through the people that decide this, say one individual care provider is required for each member. And you're applying, yes, it applies to the McKenna's, but you're applying a rule of, in that situation, the two providers, because they're living in the same house, get half the money. Correct. If any of the money is not for heat and having a house, but it's for the cost of the care, then how can it be rational to only the money should be to give the care? You've zeroed that out for one of the caregivers. That does seem irrational. But we are looking at economies of scale still, even for the McKenna's. And so, again, it doesn't fit this particular case, but with a generally applicable rule, we are looking at economies of scale, paying one provider versus paying two providers, so that we can take that money and put it into services for other members who need it. But you agree, you approved, not you, but the State of Maine approved two providers. Ultimately, yes, I approved Mr. McKenna to be a DSP in that home, but did not approve the reimbursement rate for each provider. So he was providing the services pursuant to a contract, I believe, with the Administrative Oversight Agency. So we've basically put the sword of Dan McLeese, from a prior case today, over the head of one of the DSPs and said, if you want to take care of your child, that's all well and good, but your services, which are 24 hours a day, are reimbursed at zero. That's our rational approach to this problem. I'm not sure if he was getting any reimbursement from the Oversight Agency. The Department was not reimbursing for two DSPs to the Oversight Agency. That's correct. That is correct. So what we're trying to find is rational. Let's assume you've got two houses, one parent in each house, and one child in each house. The State's going to pay $140 to each parent in that situation. Correct. That's correct. And the rule here that you're defending is that, say the parents reconcile and they move back into the same house with the children living together, all of a sudden 50% of the total pay will be gone. That is under the general application of the rule. I suppose families could ask for a reasonable modification of that rule to allow for But that's two providers. You can modify it for these individuals. That is the general application of the rule, yes. So it's that we're asking, what's the rationality behind that? And it just can't be that, well, it costs the State less because that would justify virtually everything that the State doesn't want to do. So there has to be some rationality to why they're choosing to have an expense reduction there. There must be something more to that. There was another rationale offered, I believe, at the administrative level. And again, we're looking at legal protection here, so it's any conceivable set of facts. One of the rationales that the department did offer was that in a shared living situation, you want to have a home situation and authorizing multiple direct support professionals to take care of multiple members at the same location could turn a situation into a group home situation, which is a different service under main care. Again, and that's the general rationale for application of that two-member serve rule. And that could serve as a rational basis in this case as well for the general application of the rule. And you're saying that argument was made in State court? Yes. Not here? Yes. Here, I think in your brief, you give an example. Serving meals would be more efficient with two. Are there any other examples? Serving meals, doing activities together. So I buy all that, but I guess what I don't understand is that might be a discount and that might be rational, but you went to zero as if DSP number two was doing nothing. And that seems irrational because clearly they were doing something. And you went to zero. And so the economy of skill argument makes sense. It's rational, I think, for a discount. But I guess I'm having trouble understanding how you got to zero. Well, I would point out that the Maine legislature did approve the reimbursement rule for main care and did approve the rate for one-member serve versus two-member serve, and it is half. So it's 156 per diem for one member. If you had two entirely unrelated people, that would apply as well. It doesn't just apply to families. It applies to any member who wants to live with another member in the same location with one direct support professional. One direct support professional, the idea being the level of care required is not as high. So in that case, you'd get $156 a day, but it would be for two people because you don't have to give them as much care. Correct. I guess what's potentially irrational about this is that the decision was we're just not paying anything for care of member number two in this circumstance because we don't have to because they're living in the same house, which seems to zero out really what's in large measure being paid for, which is the care. Correct. But the reimbursement is 78 per member for two members living in the same home. So I guess I would argue that it's not really zero. It's 78 per member. Right. But there are two people versus one. Correct. So that second person is really not being paid. How do we think about the fact that this practice of the state applies not just to families but unrelated individuals? And how do we look back then into what the fundamental constitutional right is here, which as I understand it is the right of families to associate with one another? If the rule is not directed at that but has an effect on that, then what do we do about it? I don't think this substantially and directly interferes with fundamental right or the fundamental right to live together. The department has the responsibility to determine what services are available at a certain location. The department has not said in this case or any other case that families cannot live together or they're prohibited from living together. I think ultimately this does come down to the reimbursement rate, which Judge Aframe mentioned earlier. I don't believe that the risk of institutionalization is a constitutional violation for purposes of this Fourteenth Amendment argument, so I don't think it does affect the fundamental right for the family to live together. So even if that had been alleged in the complaint, I don't think it would get the McKenna's to where they need to be as far as impingement of a fundamental right here. And that's because there's no direct regulation on how they choose to live? There's just a limitation only on funding?  And even if it makes it, let's just assume it makes it impossible. That's too bad, but that's not a constitutional problem? I'm not saying it's too bad. Too bad or not too bad. Yes, I don't think it's a constitutional issue. I do think that the two cases that the McKenna's have cited in their brief, Sussman and Fisher, stand for the proposition that the risk of institutionalization or unnecessary institutionalization may make out a claim under Title II of the ADA, but I don't think it necessarily makes out a constitutional violation. Those two cases did not involve constitutional claims. So we are talking about whether it's a constitutional violation where there is a substantial risk of institutionalization because services aren't provided or funded. And I believe it was mentioned earlier as well that the State does not have the obligation to fund the facilitation of constitutional rights. Do DSPs, I assume there's a rule they can't have other employment? I don't know, Your Honor. I don't know that. I mean, they have to provide 24-hour-a-day care? I think it depends on what the member's needs are. But for a single, what we have here, it's 24-hour-a-day care, right? I believe that's what the McKenna's require, yes. And is that a requirement to have the single member 156, whatever it is, dollar-a-day reimbursement? I believe so. In other words, if they don't get this money, they really don't have another way to make any money. I don't know that for sure. So I just want to talk about whether it would have helped McKenna's to be able to amend their complaint to include the allegations that they're now making in their briefs. Again, I don't think, given what we know in this situation, that the McKenna's were not institutionalized and that services are being provided at the level that they requested, I don't think that any additional allegations would serve to further their argument that sovereign immunity should be abrogated here or that there was a violation of a constitutional right, again, because I don't think that just the risk of unnecessary institutionalization I don't think would be a constitutional right or direct and substantial interference with a fundamental right. I also just want to touch on the city of Bern analysis, the three-part analysis. The district court found that the McKenna's did not meet their burden on the first two prongs, the first one being to identify a specific constitutional right that is at issue, the second being a history or pattern of constitutional violations in the category that we're talking about, and the McKenna's did not really make an argument on appeal with respect to those first two prongs. So I think they've waived their argument under city of Bern. So you're saying the and? I think that formulation has the word and in it. You say each of the three requirements have to be satisfied. Correct. The court found the first two not, so didn't address the third. Correct. All they're complaining about is failure to address the third, which is moved if the judge is correct on the first two. That's correct, yes. And it was the McKenna's burden throughout this case to prove every element of both tests. That doesn't eliminate the need to assess the rationality of the rule. Correct, but it's also McKenna's burden under the rationality test to negate every conceivable set of facts that would provide a rational basis. I just want to make sure I know what those are. One is cost savings. Yes. And the other one is might lead in certain circumstances to the creation of a group home, which is a different regulation. Correct. Those are the two hypotheticals you have put forward. Correct. You're not suggesting there's anything else we should think of? I can't think of anything right now, Your Honor. Well, right now. You've been on this case for a while. I have been, yes. I think those are the two major justifications. Are there minor ones? Not that I have right now, no. Thank you. Thank you. Thank you. That concludes argument in this case.